Tracey Salmon-Smith, Esq.
Justin M. Ginter, Esq.
**FAEGRE DRINKER BIDDLE & REATH LLP**
600 Campus Drive
Florham Park, New Jersey 07932
Tel.: (973) 549-7000
tracey.salmonsmith@faegredrinker.com
justin.ginter@faegredrinker.com

Martin S. Chester, Esq.*
Kate E. Middleton, Esq.*
**FAEGRE DRINKER BIDDLE & REATH LLP**
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota  55402
martin.chester@faegredrinker.com
kate.middleton@faegredrinker.com
*pro hac vice forthcoming*

*Attorneys for Plaintiff Honeywell International Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HONEYWELL INTERNATIONAL INC., <br><br> Plaintiff, <br><br> -v- <br><br> ITRON, INC. and BENJAMIN HUGGINS, <br><br> Defendants. | Civil Action No.: <br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Defendant Benjamin Huggins ("Huggins") was Honeywell International Inc.'s ("Honeywell") Vice President of Global Sales and responsible for Honeywell's Process Solutions businesses, including Smart Energy ("SME"). Huggins has breached his non-compete agreement with Honeywell by accepting employment as a sales executive with defendant Itron, Inc. ("Itron"), Honeywell's number-one global competitor in the smart energy market.

2.      At Honeywell, Huggins was responsible for the sales performance and commercial strategy of Honeywell's SME business—the precise responsibilities Huggins now holds at Honeywell's competitor, Itron.  Huggins knows Honeywell's near-term and long-term SME commercial strategies, its vulnerabilities, and its strategy for capturing a greater market share, including its strategy for competing against Itron.  All of this information is extremely confidential and proprietary, and of great competitive value to Itron.

3.      Honeywell is forced to commence this action to prevent the harm that it is, and will continue to suffer, from Huggins' breaches of his contractual obligations to Honeywell and his misappropriation and threatened misappropriation of trade secrets.

## PARTIES

4.      Honeywell is a Delaware corporation with significant business operations in Morris Plains, New Jersey, and its global headquarters is in Charlotte, North Carolina.

5.      Honeywell manufactures and sells "Smart Energy" products including gas, electricity, and water meters and related software to utilities, municipalities, and distribution companies worldwide.

6.      Defendant Itron is a Washington State corporation with its principal place of business in Liberty Lake, Washington.  Itron conducts business in the State of New Jersey and maintains an office in West Trenton, New Jersey. Itron is registered to accept service in New Jersey through its registered agent, National Registered Agents, Inc. of NJ, 100 Canal Pointe Boulevard, Suite 108, Princeton, NJ 08540.

7.      On information and belief, Itron conducts business throughout the United States and in more than 100 countries.  Itron competes with Honeywell in the smart energy sector.

8.      On information and belief, defendant Benjamin Huggins is a resident of the State of Texas.

## JURISDICTION AND VENUE

**9.**     This Court has jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) because the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs, in that the money damages that the plaintiff seeks,

combined with the monetary value of any injunctive relief that the plaintiff may

seek, exceeds $75,000, and the controversy is between citizens of different states.

The Court also has jurisdiction over the subject matter of this action because

Honeywell's allegations arise under 18 U.S.C. § 1836(b), which provides for a

right of civil action for misappropriation and threatened misappropriation of trade

secrets.  Venue and jurisdiction are proper in this District because Huggins and

Honeywell consented to the jurisdiction of this Court and venue in this District.

## FACTS

### Honeywell's Smart Energy Business

10.     Honeywell's SME business sells smart gas, electric, and water meters

and connected software to utilities, municipalities, and energy distribution

companies that provide natural gas, electricity, and water services.

11.     The smart energy market is relatively small, and the customer base in

the smart energy market gets smaller every year due to regular consolidations

among and acquisitions of utility companies. As a result, the smart energy market

is extremely competitive.

12.     Itron is Honeywell's main competitor in the smart energy sector. Itron is more than twice the size of Honeywell's SME business.  A significant portion of Honeywell's commercial strategy for SME is directed at capturing a larger share of the marketplace by competing with Itron. To successfully compete with a larger player like Itron, Honeywell's SME business must be innovative, agile, and use creative strategies to plan short and long-term market advances.

13.     In this competitive environment, efficient and innovative execution of commercial strategies is crucial.  These commercial strategies—focused on sales effectiveness, meeting sales objectives, and using metrics to evaluate the pursuit of customers—are extremely important parts of Honeywell's efforts to grow SME's sales numbers and its competitive posture against Itron.

**Huggins' Employment as Vice President of Sales Responsible for SME**

14.     Huggins began working for Honeywell in 2005.  Over several years, he advanced through multiple positions.  On September 28, 2018, Huggins accepted the position of Vice President, Global Sales ("Vice President of Sales"), for Honeywell Process Solutions ("HPS"), a division comprised of several smaller business lines, including Honeywell's SME business.

15.     Vice President of Sales was a senior position, and Huggins was compensated accordingly.  In 2019, the last full year Huggins worked at Honeywell, his compensation was several hundred thousand dollars.  This amount

does not include growth in stock grants that Honeywell provided to Huggins, which added even more money to Huggins' total compensation.

16.     As Vice President of Sales, Huggins was responsible for driving the overall sales performance and commercial strategy of SME and the other business units within HPS.  Huggins had this responsibility for SME throughout his tenure as Vice President of Sales.

17.     During Huggins' time as Vice President of Sales, he addressed a broad spectrum of responsibilities for the SME business line.  For example, until early 2019, Huggins' time as Vice President of Sales, he was directly involved with SME's on-the-ground sales force.  Huggins participated in weekly "Pulse" phone calls with SME sales leadership to discuss, in granular detail, SME's weekly sales metrics, including SME's weekly sales forecasts, lost opportunities with customers, and potential opportunities with current and prospective customers.

18.     After early 2019, day-to-day managerial responsibility for SME's sales force shifted to SME's new Vice President/General Manager, William Yu. Nevertheless, Huggins continued to be responsible for SME's sales performance and commercial strategy.

**Huggins' Responsibility for SME Commercial Strategy**

19.     Although he was no longer responsible for day-to day supervision of SME salespeople after early 2019, Huggins' involvement in Honeywell's SME

business grew, particularly after late 2019 when SME began increasingly promoting its connected gas products and solutions.

20.     As the sales leader responsible for SME's commercial strategy, Huggins developed and implemented tactics designed to maximize sales and revenue, improve financial metrics, identify and obtain customers, and meet or exceed SME sales goals.  This involved ensuring that sales teams for SME were identifying the right sales channels, pursuing the appropriate targets and high value markets, and implementing effective marketing activities.

21.     For example, part of Huggins' job was to implement the processes necessary to ensure that SME was capturing the sales data needed to design and implement a commercial strategy.  This included ensuring that the sales team for SME was documenting critical sales information, like customer interactions, marketing and lead generation, sales conversions, customer satisfaction and dissatisfaction, and customer account value.

22.     These are important metrics that Honeywell uses to determine whether SME and the other business units within HPS are meeting their performance goals.  Huggins was evaluated in part based on how well SME and his other businesses achieved the metrics for which he was responsible.

23.     This data also helped Huggins work with Honeywell business leaders to identify high-value markets in which SME should invest, and low-value markets in which SME should reduce its investment.

24.     Huggins also worked with SME and HPS leadership to identify and understand SME's demand generation and performance gaps, which he presented to Honeywell leadership on a weekly basis.  In his meetings with executive leadership, Huggins identified and explained gaps in SME's anticipated and actual sales, and identification of potential customers, and along with William Yu, SME's Vice President and General Manager, detailed SME's forecasted sales and annual revenue.

25.     Huggins also presented at monthly meetings with Honeywell executive leadership to discuss SME's performance, growth strategy, finances, and product and sales pipelines.  Honeywell leadership looked to Mr. Huggins to use this sales and performance data to improve SME's performance.

**Huggins' Operational and Strategic Planning for SME**

26.     Another of Huggins' duties was to ensure that that SME's commercial strategy was consistent with HPS's global strategic plan.  As part of this, Huggins contributed to developing the Annual Operating Plan governing SME, as well as a 3-year strategic plan (called a "STRAP").

27.     The Annual Operating Plans and STRAP contain profoundly sensitive and competitively valuable information about the present state and future plans for Honeywell's SME business.

28.     In helping develop the Annual Operating Plans and STRAP, Huggins worked with other Honeywell business leaders to analyze and make plans regarding SME's budget, sales opportunities, weaknesses in customer relationships, market vulnerabilities, sales and product pipelines, market strategy, forecasts, and growth strategy.  Central to these strategic plans was Honeywell's largest global competitor, Itron.

29.     In these strategic planning meetings, Huggins and other business leaders discussed, among other things, SME's budget, how to drive SME growth by, for example, prioritizing the sale of certain offerings with certain customers and in particular markets, and  key SME sales opportunities and product innovations.  Huggins was an active participant in these strategic meetings, providing important input that helped determine SME's portion of the strategic plan.

30.     Huggins also participated in Annual Operation Plan meetings in which he and other business unit leaders discussed forecasted annual sales revenue, allocation of resources, and supply and demand, among other things in order to develop SME's Annual Operating Plan for 2020 and 2021.

31.     The Annual Operating Plan also specifically addressed how Honeywell intended to compete against Itron, and identified Honeywell's specific competitive strengths and weaknesses compared to Itron.  The Annual Operating Plan serves as a guide by which Honeywell designed SME's growth strategy to increase its market share, including by targeting certain markets and customers, to compete specifically against Itron.

32.     Huggins analyzed the Annual Operations plan for SME as part of his duties.  For example, in April 2020, Huggins worked with SME's Sales Excellence Manager seeking information as part of a "deep dive" he was conducting into SME's sales Annual Operating Plain and Sales Incentive Plan for 2020.  This involved assigning SME team members assignments, such as auditing SME sales metrics to ensure that the team was following the Annual Operating Plan.

**Huggins' Work with the SME Sales Team**

33.     By mid-2019, Huggins no longer had day-to-day management of the SME sales force.  Nevertheless, he continued to provide guidance to the sales team, which reported to him on a "dotted line" basis.  For example, in January 2020, at the HPS annual sales kick-off meeting, Huggins participated in SME's working sessions, at which SME business leadership detailed SME's Annual Operating Plan, growth strategy, market strategy and competitive weaknesses.

34.     This included a discussion of SME's top twenty customer accounts, the amount of business currently generated by those customers, and the monetary value of each account.  Also addressed were specific business challenges in the SME business and the strategy to address them.  In addition, the attendees discussed SME's gap assessment, which compares SME's actual performance with its expected performance.  The meeting also discussed competitive market strategy, in particular SME's priority on displacing Honeywell's competitors, namely Itron, with Honeywell's SME offerings.  These meetings were not open to the public and were restricted to Honeywell personnel.

35.     Although his main job duties focused more on commercial strategy than visiting customers, Huggins did participate in an SME sales pitch during his time as Vice President of Sales—in which SME was bidding against Itron—to obtain a customer's connected gas business. Following the pitch, Huggins provided SME's sales team with guidance and feedback, including with regard to SME's pricing proposition to the customer.  Much of the information SME's sales team presented at the pitch, particular with regard to SME's pricing proposition for that customer, is confidential and non-public.

**Huggins Was Held Accountable for SME Performance**

36.     Huggins' annual performance reviews addressed his effectiveness at influencing SME's profitability and growth, and his superiors suggested areas in

11

which Huggins needed to improve, including increasing SME's sales performance and productivity by leveraging SME's sales metrics.

37.    Huggins had weekly and monthly coaching sessions with Honeywell leadership, in which he regularly discussed his efforts to positively influence SME's sales performance.

**Huggins Possesses Competitively Valuable Honeywell Trade Secrets, Proprietary and Confidential Information**

38.    Huggins' job as Vice President of Sales responsible for SME was inextricably bound up with the strategic, financial, sales, and other information described above.

39.    For example, not only does Huggins know Honeywell's specific strategy for competing against Itron, but he knows Honeywell's broader market and growth strategies in the smart energy sector.  He also has knowledge of SME's product pipeline, strengths and challenges with certain products, where SME may face vulnerabilities from competitive bids, and strengths and weaknesses in customer relationships.

40.    Huggins also knows which markets and products SME is prioritizing in order to gain a larger market share, and he knows SME's strategy for competing against Itron, including in which markets and with regard to which products SME is working to displace Itron.

41.     All of this information amounts to a roadmap for how Honeywell SME intends to compete against Itron, the specific tactics that Honeywell intends to use, and the challenges and vulnerabilities that Honeywell may see in its own approach.

42.     All of this information is highly confidential and competitively valuable, and is part of the Honeywell Trade Secrets, Proprietary and Confidential Information that Huggins agreed to protect.

43.     This information is closely kept at Honeywell.  It is shared only with those in a leadership position who need to know the information.  Meetings discussing this strategic information are limited to only those who must attend, and materials containing this information are circulated only to those who must receive them.  Confidential materials are labeled as such.

44.     Honeywell also takes steps to ensure that these Trade Secrets, Proprietary and Confidential Information—most of which are stored in electronic form—are protected. Honeywell also maintains security around its electronic data and computer networks.  For example, Honeywell employs technical "Data Loss Prevention" capabilities to monitor and catch individuals who may be trying to improperly remove Honeywell data from its networks.  Each Honeywell employee also has a unique username and password that must be entered before accessing Honeywell's internal network, and employees are required to regularly change

their passwords to enhance security. Various information technology tools are used to monitor the handling of Trade Secrets, Proprietary and Confidential Information, and Honeywell employees' access to such information is limited to that which they need to use for their jobs.

45.     Honeywell also takes other steps to protect its Trade Secrets, Proprietary and Confidential Information. For example, in addition to having its employees like Huggins sign non-disclosure agreements, Honeywell also requires third-party business partners to sign non-disclosure agreements before Honeywell will share with them any of its Trade Secrets, Proprietary and/or Confidential Information.

46.     Honeywell also maintains the security of its headquarters and offices. Entrances to Honeywell facilities are monitored, and employees are required to use an electronic personnel badge to enter the facilities. Visitors sign in upon arrival, wear badges, and are escorted by Honeywell employees. In addition, Honeywell uses security cameras to protect its facilities and monitor compliance with its policy of restricted access.

47.     The Honeywell Trade Secrets, Proprietary and Confidential Information that Huggins knows are highly valuable to Honeywell because they are kept secret from Itron and other competitors. And this information will be highly valuable to Itron. For example, the information that Huggins knows about

where Honeywell intends to make investments in SME, SME products on which Honeywell intends to focus, areas of the SME business that Honeywell internally believes need improvement, strategic customer and channel partner relationships, and proprietary sales incentive programs will give Itron an unfairly-gained competitive advantage, unfairly harming Honeywell in the marketplace.

48.    If Itron is able to obtain and exploit the Honeywell Trade Secrets, Proprietary and Confidential Information that Huggins knows, Honeywell's ability to compete in the marketplace will be irreparably harmed.  Proprietary information about Honeywell's SME market strategy, sales strategies, customer relationships (including weaknesses in customer relationships and prospective customer relationships), margins for Honeywell's SME products and solutions, pricing and value proposition strategies, and product information will be easily used and exploited by Itron to displace or disrupt Honeywell's market, sales, and growth strategies, and Honeywell's relationships with existing and prospective customers. This information will also enable Itron to prospect for clients based on the leads that Honeywell developed, and provide it with the opportunity to poach Honeywell's sales leads.

**Huggins' Non-Compete Agreement with Honeywell**

49.    Because of Huggins' executive sales role, in which Honeywell's competitively-valuable Trade Secrets, Proprietary and Confidential Information

15

about SME and other areas of Honeywell's business was inextricably linked with his job duties, Honeywell recognized that it has an important business interest in protecting the Trade Secrets, Proprietary and Confidential Information, goodwill, and other legitimate business interests associated with Huggins' employment.

50.    Accordingly, as a condition of Huggins employment as Vice President of Sales, he was required to execute a Non-Compete Agreement for Senior Executives (the "Non-Compete Agreement"), which he signed on September 28, 2018.

51.    Honeywell does not require all of its employees to sign non-compete agreements.  Only senior executives and other employees, who by the very nature of their roles and responsibilities have jobs that are intimately intertwined with Honeywell's Trade Secrets, Proprietary and Confidential Information, goodwill, and other legitimate business interests are required to sign non-compete agreements.

52.    In Section 1 of the Non-Compete Agreement, Huggins acknowledged that "Honeywell operates in a very competitive business environment and my services are and will be of special, unique and extraordinary value to Honeywell."

53.    Huggins also acknowledged that in the course of his employment with Honeywell, he will "become familiar with Trade Secrets, Proprietary and Confidential Information concerning Honeywell," including but not limited to,

Honeywell's "strategic plans, plans for acquisition or disposition of products, expansion plans, financial status and plans, financial data, customer lists and data, and personnel information."

54.     Huggins agreed that for a period of one year following his termination of employment with Honeywell for any reason, he will not:

> become employed by, perform services for, or otherwise become associated with…a Competing Business…that conducts business in the same or substantially similar geographic area in which any Honeywell business, for which I was employed or performed services…during the Look Back Period, conducts business or plans to conduct business as of my Termination of Employment.

55.     "Competing Business" is defined as any business that:

> (i) conducts or is planning to conduct a business similar to and/or in competition with any business conducted or planned by any Honeywell business for which [Huggins] (A) was employed or performed services in [his job as Vice President of Sales], or (B) had knowledge of operations over the Look Back Period, or (ii) designs, develops, produces, offers for sale or sells a product or service that can be used as a substitute for, or is generally intended to satisfy the same customer needs for, any one or more products or services designed, developed, manufactured, produced or offered for sale or sold by any Honeywell business for which [Huggins] (X) was employed or performed services in [his job as Vice President of Sales], or (Y) had knowledge of operations during the Look Back Period.

56.     The "Look Back Period" under the Non-Compete Agreement is the two-year period ending on the date of Huggins' termination of employment from Honeywell.

57.     Huggins agreed that if he "intend[s] to become employed by…a Competing Business as defined above, it is presumed that the [one-year non-compete] restriction…applies."

58.     Huggins also expressly agreed that if "I do not believe the [one-year] restriction…should apply, I must demonstrate to Honeywell that I will only be employed by, perform services for, or otherwise become associated with…a line of business, or part of, a Competing Business that does not compete with Honeywell…."

59.     In Section 2 of the Non-Compete Agreement, Huggins agreed that the terms of the Non-Compete Agreement are reasonable and do not impose a greater restraint than necessary to protect Honeywell's legitimate business interests, including the protection of its Trade Secrets, Proprietary and Confidential Information.  In Section 4 of the Non-Compete Agreement, Huggins again agreed and acknowledged that "the restrictions contained in this Agreement do not preclude me from earning a livelihood, nor do they unreasonably impose limitations on my ability to earn a living."

60.     In Section 3 of the Non-Compete Agreement, Huggins acknowledged that a remedy at law for "any breach or threatened breach" of the agreement "would be inadequate."  Huggins therefore agreed that "Honeywell shall be entitled to injunctive relief in case of any such breach or threatened breach."

Huggins also acknowledged and agreed that "violation of this Agreement would cause irreparable harm to Honeywell…."

61.     In Section 3 of the Non-Compete Agreement, Huggins also agreed to reimburse Honeywell for all attorneys' fees and costs incurred in enforcing the terms of the Non-Compete Agreement.

62.     Huggins also agreed, in Section 1 of the Non-Compete Agreement, that he would not directly or indirectly, at any time during or after his employment with Honeywell, except in the course of performing his duties at Honeywell, disclose or use Honeywell's Trade Secrets, Proprietary and Confidential Information.

63.     In Section 8 of the Non-Compete Agreement, Huggins agreed that for one year immediately following the end of his employment with Honeywell, he will inform each new employer, prior to accepting employment, of the existence of the Non-Compete Agreement and provide that employer with a copy of it.

64.     Section 9 of the Non-Compete Agreement contains a choice-of-law clause, providing that it shall be governed by and construed in accordance with the laws of the State of New Jersey without regard to its principles of conflicts of law.

65.     In signing the Non-Compete Agreement, Huggins also consented to the exclusive jurisdiction and venue in the federal and state courts of the State of

New Jersey, Morris County, for the resolution of all disputes arising under or relating to the agreement.

66.     The Non-Compete Agreement has an Addendum, which contains a partial, non-exhaustive list "for illustration purposes only," of some competitors that are considered a Competing Business.  Huggins acknowledged that Competing Businesses "may include other persons or entities now or in the future." Huggins acknowledged that if he "worked in multiple Honeywell business [subject to the Non-Compete Agreement] during [his] tenure, it is very likely that the list of Competing Business subject to restriction under the terms of [his] Noncompete Agreement will be broader than the…illustrative list."

67.     The Addendum instructed Huggins: "If you have questions about whether any prior Honeywell position which you have held during the Look Back Period subjects you to [non-compete] restrictions, and will be used to identify Competing Business(es), you should contact your Human Resource representative."

## Huggins' Agreement with Honeywell Regarding Trade Secrets, Proprietary and Confidential Information

68.     As a condition of his initial employment with Honeywell, and also as a condition of his subsequent hiring as Vice President of Sales, on September 28, 2018, Huggins also signed an Employee Agreement Relating to Trade Secrets, Proprietary and Confidential Information (the "IP Agreement").

69.     In Section 6 of the IP Agreement, Huggins agreed that he "will not engage…for a period of two years following my Termination of Employment for any reason, in any activity or employment in the faithful performance of which it could be reasonably anticipated that I would use or disclose Honeywell's Trade Secrets, Proprietary and Confidential Information."

70.     Section 20 of the IP Agreement defines Trade Secrets, Proprietary and Confidential Information as "information which is not generally known in the industry in which Honeywell is engaged…which includes, without limitation, any information, whether patentable, patented or not, relating to any existing or contemplated products, inventions, services, technology, ideas, concepts, designs, patterns, processes, compounds, formulae, programs, devices, tools, compilations of information, methods, techniques, and including information relating to any research, development, manufacture, purchasing, engineering, know-how, business plans, sales or market methods, methods of doing business, customer lists, customer usages or requirements, or supplier information, which is owned or licensed by Honeywell or held by Honeywell in confidence."

71.     In Section 16 of the IP Agreement, Huggins agreed that "remedy at law for any breach or threatened breach of the provisions of this Agreement would be inadequate and therefore agree that Honeywell shall be entitled to injunctive relief in case of any such breach or threatened breach."

72.     The IP Agreement also contains restrictions on solicitation of Honeywell employees, customers, suppliers, business partners and vendors.

73.     Huggins also agreed in Section 16 that if "a court determines that I have breached or threatened to breach this agreement, I agree to reimburse Honeywell for all attorneys' fees and costs incurred in enforcing the terms of the agreement."

74.     Section 18 of the IP Agreement contains a choice-of-law provision which provides that the IP Agreement "shall be governed by and construed in accordance with the laws of the State of New Jersey without regard to its principles of conflicts of law."

**Huggins Resigns from Honeywell to Join Itron**

75.     On November 10, 2020, HPS president John Rudolph informed Huggins' Human Resources contact, Jeremy O'Brien, that Huggins was resigning from Honeywell.

76.     That same day, O'Brien texted Huggins that same day in an effort to discuss the departure, but Huggins was not available to speak.

77.     The next day, O'Brien again reached out to Huggins in an effort to discuss his resignation.  On that telephone call, Huggins told O'Brien that he had accepted employment with Itron, which Huggins knew was the primary competitor of Honeywell's SME business.

78.     Upon learning that Huggins was working for Itron, Honeywell decided that Huggins' employment needed to end that day.  O'Brien called Huggins back, and told him to come into the office immediately to return all of his Honeywell-issued electronic devices and any other Honeywell property.

79.     When Huggins arrived, he and O'Brien conducted an exit interview. During the interview, O'Brien presented Huggins with a copy of his Non-Compete Agreement.  O'Brien expressed concern that Huggins' employment as a sales leader for Itron would violate the Non-Compete Agreement.

80.     Huggins responded that he was aware of the Non-Compete Agreement, and that he had provided a copy of the Agreement to Itron.

81.     Huggins also acknowledged that Itron is a direct competitor of Honeywell's SME business.  Huggins said that he could understand how Honeywell would consider his employment with Itron as a violation of his Non-Compete Agreement, even though he said he did not agree that it was a violation.

82.     Huggins also told O'Brien that he understood his acceptance of employment with Itron may lead Honeywell to seek forfeiture stock units he had been granted by Honeywell.

83.     On information and belief, Huggins' new role as Itron's Senior Vice President of Customer and Market Experience, will involve him, among other things, leading Itron's sales, marketing, channel management, business

development, and customer success activities.  These duties include the same or similar responsibilities that Huggins performed at Honeywell regarding its Smart Energy business.

## COUNT 1
## BREACH OF CONTRACT: NON-COMPETE AGREEMENT
### (Against Huggins)

84.     Honeywell realleges and incorporates by reference herein the foregoing allegations of the Complaint.

85.     Huggins has a valid Noncompete Agreement for Senior Executives with Honeywell.

86.     In the Non-Compete Agreement, Huggins agreed that for a period of one (1) year following his termination of employment from Honeywell for any reason, he would not become employed by, perform services for, or otherwise become associated with a Competing Business, as defined in Section 1 of the Non-Compete Agreement.

87.     Huggins' employment with Honeywell terminated on November 11, 2020.  Huggins is now employed by Itron, which is a Competing Business as that term is defined in Huggins' Non-Compete Agreement.

88.     In his position as Itron's Vice President for Customer and Market Experience, Huggins will be employed by and performing services for a business that conducts business similar to and in competition with the Honeywell businesses

for which: (a) Huggins was employed and performed services in a job covered by Honeywell's program requiring certain employees to sign non-compete agreements; (b) Huggins had knowledge of operations during the two-year Look-Back Period ending on the date of his termination of employment from Honeywell.

89.     In his position as Itron's Vice President for Customer and Market Experience, Huggins will be employed by and performing services for a business that designs, develops, produces, offers for sale or sells a product or service that can be used as a substitute for, or is generally intended to satisfy the same customer needs for, any one or more products or services designed, developed, manufactured, promoted or offered for sale or sold by the Honeywell businesses for which: (a) Huggins was employed and performed services in a job covered by Honeywell's program requiring certain employees to sign non-compete agreements; and/or (b) Huggins had knowledge of operations during the two-year Look-Back Period ending on the date of his termination of employment from Honeywell.

90.     All this conduct by Huggins, as detailed above in this Complaint, breaches his Non-Compete Agreement.

91.     If Huggins is not enjoined from working for Itron as described in this Complaint, Honeywell will suffer irreparable harm.  Honeywell also has been and

will be damaged by Huggins' wrongful conduct in an amount to be determined at trial, but which is no less than $75,000.

## COUNT 2
## BREACH OF CONTRACT: IP AGREEMENT
### (Against Huggins)

92.     Honeywell realleges and incorporates by reference herein the foregoing allegations of the Complaint.

93.     Huggins has a valid Employee Agreement Relating to Trade Secrets, Proprietary and Confidential Information with Honeywell (the "IP Agreement").

94.     In the IP Agreement, Huggins agreed, among other things, that for a period of two years following his termination of employment from Honeywell for any reason, he will not engage without the prior written consent of Honeywell's Law Department, in any activity or employment in the faithful performance of which it could be reasonably anticipated that he would use or disclose Honeywell's Trade Secrets, Proprietary and Confidential Information.

95.     Huggins also acknowledged in the IP Agreement that he has the right to use or practice any skill or expertise generally associated with this employment but not special or unique to Honeywell, but that he does not have the right to use, practice, or disclose Honeywell's Trade Secrets, Proprietary and Confidential Information for his own benefit or for the benefit of any third party.

96.     Huggins' employment as Honeywell's Vice President of Sales terminated on November 11, 2020.  As Vice President of Sales, Huggins had responsibility for, among other things, the commercial strategy and sales performance for Honeywell's Smart Energy business line.  In this capacity, Huggins had access to and knowledge of Honeywell Trade Secrets, Proprietary and Confidential Information regarding its Smart Energy Business, as described in more detail above in this Complaint.

97.     Huggins is now employed by Itron as its Vice President of Customer and Market Experience.  This employment breaches Huggins' IP Agreement because—as discussed in more detail above in this Complaint—in this position he will be engaging in "employment in the faithful performance of which it could be reasonably anticipated that [Huggins] would use or disclose Honeywell's Trade Secrets, Proprietary and Confidential Information."

98.     If Huggins is not enjoined from working for Itron as described in this Complaint, Honeywell will suffer irreparable harm.  Honeywell also has been and will be damaged by Huggins' wrongful conduct in an amount to be determined at trial, but which is no less than $75,000.

## COUNT 3
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Against Itron)

99.     Honeywell realleges and incorporates by reference herein the foregoing allegations of the Complaint.

100.    Huggins has a valid and enforceable Non-Compete Agreement and a valid and enforceable IP Agreement with Honeywell.

101.    Itron knew about the Non-Compete Agreement and the IP Agreement before hiring Huggins.  In particular, Itron was aware of the Non-Compete Agreement's prohibition on Huggins working for a Competing Business for one year after leaving Honeywell.  On information and belief, Itron also was aware of the IP Agreement's two-year prohibition on Huggins working in any job in the faithful performance of which it could be reasonably anticipated that he would use or disclose Honeywell's Trade Secrets, Proprietary and Confidential Information.

102.    Despite Itron's knowledge of the restrictions contained in Huggins' Non-Compete Agreement and IP Agreement, Itron's hiring of Huggins him into a position in which he will necessarily violate the Non-Compete Agreement and the IP Agreement was done intentionally and with malice, and was done to take advantage of the Honeywell Trade Secrets, Proprietary and Confidential Information that Huggins possesses.

103.    Itron's tortious interference will cause Honeywell to suffer irreparable harm if not enjoined.  Honeywell will also suffer money damages in an amount to be determined at trial, but which is no less than $75,000.

## COUNT 4
## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. 1836(b)
### (Against All Defendants)

104.    Honeywell realleges and incorporates by reference herein the foregoing allegations of the Complaint.

105.    Honeywell possesses trade secrets related to its Smart Energy business including, but not limited to, the Honeywell Trade Secrets, Proprietary and Confidential Information.

106.    Defendants have acquired and have used, are threatening or planning to use, or will inevitably use Honeywell's Trade Secrets, Proprietary and Confidential Information under circumstances in which they knew or had reason to know that they possess the Honeywell Trade Secrets, Proprietary and Confidential Information without authorization.

107.    Itron has obtained Honeywell's Trade Secrets, Proprietary and Confidential Information by hiring Huggins, and Itron has placed him in a position in which he will inevitably use and/or disclose Honeywell Trade Secrets, Proprietary and Confidential Information for the benefit of Itron.

108.   Huggins obtained Honeywell's Trade Secrets, Proprietary and Confidential Information and, in his similar, competing position with Itron, he will inevitably use and/or disclose the Honeywell Trade Secrets, Proprietary and Confidential Information to fulfill his role as Itron's Vice President of Customer and Market Experience.

109.   The Honeywell Trade Secrets, Proprietary and Confidential Information at issue in this case are related to products or services used in, or intended for use in, interstate or foreign commerce.

110.   Honeywell has taken reasonable steps to maintain the confidential nature of its Honeywell Trade Secrets, Proprietary and Confidential Information, including but not limited to the Honeywell Trade Secrets, Proprietary and Confidential Information that Huggins and Itron have misappropriated and/or are threatening to misappropriate.

111.   Honeywell's Trade Secrets, Proprietary and Confidential Information are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

112.   Honeywell's Trade Secrets, Proprietary and Confidential Information derive actual and potential independent economic value from not being generally

known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

113.   Defendants possess Honeywell's Trade Secrets, Proprietary and Confidential Information without any color of right.

114.   Defendants' actions in misappropriating Honeywell's Trade Secrets, Proprietary and Confidential Information were done willfully and maliciously.

115.   Defendants' actions violate the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.*

116.   Defendants' misappropriation of Honeywell's Trade Secrets, Proprietary and Confidential Information has caused and will cause Honeywell damages in an amount to be determined at trial, but which is no less than $75,000.

117.   In addition, Honeywell will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent defendants' misappropriation and threatened further misappropriation, and to prevent the value of Honeywell's Trade Secrets, Proprietary and Confidential Information from continuing to inure unfairly to defendants' benefit.

## COUNT 5
## VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT, N.J.S.A. §§ 56:15-1 *et seq.*
### (Against All Defendants)

118.   Honeywell realleges and incorporates by reference herein the foregoing allegations of the Complaint.

119.   Honeywell possesses Honeywell Trade Secrets, Proprietary and Confidential Information related to its Smart Energy business, as described above. Honeywell's Trade Secrets, Proprietary and Confidential Information include information constituting trade secrets within the meaning of the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 et seq.

120.   Defendants have acquired and have used, are planning to use, and/or will inevitably use Honeywell's Trade Secrets, Proprietary and Confidential Information under circumstances in which they knew or had reason to know that the Honeywell Trade Secrets, Proprietary and Confidential Information were obtained without express or implied authority or consent and were not obtained by proper means.

121.   Honeywell has taken reasonable steps to maintain the confidential nature of its Trade Secrets, including but not limited to the Honeywell Trade Secrets, Proprietary and Confidential Information that defendants have misappropriated and/or will misappropriate.

122.   Honeywell's Trade Secrets, Proprietary and Confidential Information are nonpublic and confidential, are not generally known in the industry or elsewhere, and are not readily ascertainable through proper means by other persons.

123.   Honeywell's Trade Secrets, Proprietary and Confidential Information derive actual and potential independent commercial value from not being generally known to, or readily ascertainable through proper means by, other persons who might obtain economic value from their disclosure or use.

124.   Defendants' actions in misappropriating Honeywell's Trade Secrets, Proprietary and Confidential Information were done willfully and maliciously.

125.   Defendants' actions violate the New Jersey Trade Secrets Act, N.J.S.A. §§ 56:15-1 *et seq*.

126.   Defendants' misappropriation of Honeywell's Trade Secrets, Proprietary and Confidential Information has caused and will cause Honeywell damages in an amount to be determined at trial, but which is no less than $75,000.

127.   In addition, Honeywell will suffer irreparable harm absent injunctive relief, and is entitled to an injunction to prevent Defendants' misappropriation and threatened further misappropriation, and to eliminate the commercial advantage that Defendants would otherwise derive from the misappropriation.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Honeywell International Inc. demands judgment against defendants Itron, Inc. and Benjamin Huggins, and respectfully asks the Court to:

1. Enter judgment for Honeywell on every Count of the Complaint;

2. Enter temporary, preliminary, and permanent injunctive relief providing that:

   a. Huggins may not be employed by Itron, Inc. as its Vice President of Customer and Market Experience, or in any other capacity, until November 11, 2021.

   b. The injunction shall apply to Huggins and to all who are in active concert or participation with him.

3. Award Honeywell monetary damages, in an amount to be proven at trial, for the economic injury it has sustained because of Huggins' wrongful conduct;

4. Award Honeywell its reasonable attorney's fees incurred in connection with enforcing its rights under Huggins' Non-Compete and IP Agreements, pursuant to the terms of the Agreements;

5. Order all other relief that the Court deems proper and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial on all issues in this action.


Date: January 15, 2021              FAEGRE DRINKER BIDDLE & REATH LLP


By: */s/ Tracey Salmon-Smith*
 Tracey Salmon-Smith, Esq.
 *tracey.salmonsmith@faegredrinker.com*
 Justin M. Ginter, Esq.
 *justin.ginter@faegredrinker.com*
 600 Campus Drive
 Florham Park, New Jersey 07932

 Martin S. Chester, Esq., *pro hac vice forthcoming*
 *martin.chester@faegredrinker.com*
 Kate E. Middleton, Esq., *pro hac vice forthcoming*
 *kate.middleton@faegredrinker.com*
 2200 Wells Fargo Center
 90 South Seventh Street
 Minneapolis, MN  55402

 *Attorneys for Plaintiff*
 *Honeywell International Inc.*


US.131003925.04